[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14443
_____

D.C. Docket No. 0:17-cv-61894-BB

QUALITY OF LIFE, CORP.,
formerly known as
Margate Rehabilitation Center,
MMJ FINANCIAL SERVICES, INC.,

                                                        Plaintiffs - Appellants,

versus

THE CITY OF MARGATE,

                                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 28, 2020)

Before NEWSOM, TJOFLAT, and GINSBURG,[*] Circuit Judges.

NEWSOM, Circuit Judge:

This case arises from a protracted zoning dispute between Quality of Life and MMJ Financial Services (two Florida entities owned by Miryam Jimenez to which we'll refer collectively as "Quality of Life") and the City of Margate, Florida. Quality of Life sought and received permission from the City to operate an assisted-living facility for the elderly in an area zoned for residential use. Rather than following through with that plan, though, Quality of Life decided to open a drug-detoxification facility and insisted that the City's green light to operate an assisted-living facility also permitted it to operate a detox. When the City opposed its change of plans, Quality of Life took the dispute to court, alleging that the City's actions were motivated by discrimination against people in recovery. Having lost at summary judgment in the district court, Quality of Life argues on appeal (1) that the City's actions violated the Fair Housing Act and the Americans with Disabilities Act, (2) that the City is estopped from preventing it from operating as a drug-detox facility, (3) that the district court didn't properly address its declaratory and injunctive relief claims, and (4) that the district court erred in denying its motion for reconsideration.

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the D.C. Circuit, sitting by designation.

We reject each of Quality of Life's contentions.  We therefore affirm the district court's orders granting the City's motion for summary judgment and denying Quality of Life's motion for reconsideration.

**I**

In any given zone within the City of Margate, there are three categories of uses: (1) permitted use (*i.e.*, the use is allowed as of right), (2) special-exception use (*i.e.*, the use is allowed, so long as the City approves it), and (3) prohibited use (*i.e.*, the use isn't allowed in the zoning district at all).  Quality of Life owns the property at issue, which is located in a multi-family residential zoning district.

Quality of Life's founder, Miryam Jimenez, sought a special-exception use from the City to operate an assisted-living facility on the property.  In her application, and when appearing before the City's governing bodies, Jimenez repeatedly represented that she was applying to open an independent- or assisted-living facility for the elderly.  The City Commissioners voted 5-0 in favor of approving Jimenez's application.

After this approval, though, Jimenez notified the City that she instead wanted to open a drug-detoxification facility and began representing to others that she would do so.  For example, she put up a sign in front of the property stating "COMING SOON MARGATE DETOX" and submitted building plans to the City that included labels such as "Margate Rehabilitation Center" and references to

3

inpatient treatment areas.  The City rejected the building plans, giving as its reason that the "[s]pecial exception approval was given for [an] independent living facility."

The City sought assurances from Jimenez that she would not operate a detox facility without the City's approval.  Jimenez tendered an affidavit (requested by the City, but prepared by her attorney), in which she swore (1) that she "intend[ed] to operate a group care facility, as defined by the City of Margate Code of Ordinances, and as approved in City Resolution No. 15-010," which had approved her special-use application, and (2) that she would "not operate a detoxification facility from the Property without the prior approval of the City."  Jimenez also revised her building plans, changing the project's name from "Margate Rehabilitation Center" to "Quality of Life," and removing references to doctor's offices, exam rooms, and a laboratory.  The City subsequently approved the building plans as satisfying the "Institutional Group I-2 standards" of Florida's Building Code, which are used for both medical and residential properties.

Despite the affidavit and revised building plans, Jimenez continued to pursue a detox facility.  She contended that the special-exception use that the City had granted her to open an assisted-living facility also allowed her to open a drug-detox facility.  In a letter to the City, Jimenez acknowledged that she had said "under oath that [she would] not operate a Detoxification facility" without the City's

4

approval. Jimenez explained, however, that because there was a state-imposed moratorium on hospital beds,[1] she wanted to use her existing special exception to open a detox, which, according to her, wouldn't require "chang[ing] the zoning since the facilities are equivalent in nature."

When the City refused Jimenez's requests to open a detox under her existing approval, she—through Quality of Life—sued. As relevant here, Quality of Life claimed violations of the Fair Housing Act and Americans with Disabilities Act, argued that the City was estopped under state law from rejecting Jimenez's request, and sought declaratory and injunctive relief. After dueling motions, the district court ultimately granted summary judgment in favor of the City and denied Quality of Life's motion for reconsideration.

This is Quality of Life's appeal.[2]

## II

### A

We first examine Quality of Life's argument that the City discriminated against it in violation of the Fair Housing Act and the Americans with Disabilities

---

[1] The district court's summary judgment order states that the moratorium didn't apply to assisted-living facilities, so it apparently wouldn't have prevented Jimenez from opening one.

[2] We review the district court's grant of summary judgment de novo and "construe all reasonable doubts about the facts in favor of" Quality of Life, as the non-movant. *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 761 (11th Cir. 2005) (quotation omitted). We review a district court's denial of a motion for reconsideration for abuse of discretion. *Rodriguez v. City of Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017).

Act.  The FHA prohibits, among other things, discrimination on the basis of a handicap in the sale, rental, and financing of "dwellings" and in other housing-related matters.  42 U.S.C. § 3604(f); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir. 2008) (explaining that the Fair Housing Amendments Act of 1988 amended the FHA to add the handicapped as a protected class).  Title II of the ADA prohibits public entities from discriminating against individuals with disabilities.  42 U.S.C. § 12132; *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1081 (11th Cir. 2007).[3]

Quality of Life asserts violations of the FHA and ADA under three theories: (1) disparate treatment, (2) disparate impact, and (3) failure to provide a reasonable accommodation.  *See, e.g.*, *Schwarz*, 544 F.3d at 1216–28 (analyzing a plaintiff's FHA claims under each theory); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.5 (4th Cir. 2016) (explaining that "Title II [of the ADA] allows plaintiffs to pursue three distinct grounds for relief").  We'll consider each theory in turn.[4]

---

[3] It's unclear whether the property at issue—as Quality of Life presents it, at least—constitutes a "dwelling" and therefore whether the FHA applies.  We have held that "the longer the typical occupant lives in a building, the more likely it is that the building is a 'dwelling.'"  *Schwarz*, 544 F.3d at 1215.  In *Schwarz*, we decided that halfway houses were "dwellings" in part because guests stayed "six to ten weeks."  *Id.* at 1215–16.  Quality of Life's consultant testified that a patient's stay in the detox facility "would be short term" and "anywhere from five to 20 days."  We needn't resolve the issue here because even assuming that Quality of Life's proposed detox facility could be considered a "dwelling," its FHA claims would fail for the reasons we explain in text.

[4] The district court analyzed Quality of Life's FHA and ADA claims together.  The parties likewise don't differentiate between the FHA and ADA claims on appeal, relying on cases

**1**

To succeed on its disparate-treatment claim, Quality of Life must show that, because of the disabilities of its potential clients, it "has actually been treated differently than similarly situated non-handicapped people." *Schwarz*, 544 F.3d at 1216. Quality of Life could prove disparate treatment through either direct or circumstantial evidence. *See, e.g.*, *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276, 1283 (11th Cir. 2006). If direct evidence is put forward, the inquiry is straightforward; if circumstantial evidence is presented, however, we analyze the evidence through the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, which requires a plaintiff to first make a prima facie case of discrimination. 411 U.S. 792, 802 (1973); *see also Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 920 (10th Cir. 2012) (Gorsuch, J.) (applying *McDonnell Douglas* to FHA and ADA claims).

---

arising under both statutes as well as other federal anti-discrimination laws. While courts often analyze FHA and ADA claims in tandem, *see, e.g.*, *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012) (Gorsuch, J.) (analyzing FHA, ADA, and Rehabilitation Act claims together); *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1364 (S.D. Fla. 2012) ("Due to the similarity of the ADA and the FHA's protections of individuals with disabilities in housing matters, courts often analyze the two statutes as one."), we note that the standards governing the FHA and ADA aren't the same in all respects, *see, e.g.*, *Schwarz*, 544 F.3d at 1212 n.6 (stating that "there are important differences" between the FHA, the Rehabilitation Act, and the ADA, including that "coverage under the FHA is limited to statutorily defined 'dwellings'"). Fortunately for us, any differences between the two statutes have no impact on our analysis here; therefore, we'll address the FHA and ADA claims together.

7

Quality of Life argues that it has presented direct and circumstantial evidence of disparate treatment in the form of (a) statements from City officials and the City's administrative acts, (b) the "facially discriminatory" language of City Zoning Ordinance § 16.2(B), and (c) an amendment to the zoning code that added detoxification facilities as a permitted use in community-facility zones, but "limit[ed] detoxification facilities" to such zones. We're unpersuaded. As we'll explain, Quality of Life has not put forward either direct or circumstantial evidence of discrimination.

**a**

Quality of Life contends that statements made by City officials and some of the City's administrative acts constitute evidence of disparate treatment. We first consider Quality of Life's argument regarding City of Margate Mayor Arlene Schwartz's deposition, in which she testified (1) that having a sober house or a drug-recovery facility in a residential community "would be a concern as much as any sexual predator . . . who lives in my neighborhood," and (2) that a drug-detox facility may have a greater impact on the neighborhood because of "the clientele"—*i.e.*, "people in a medical detox could be a possible danger because their condition is far more critical and possibly far more dangerous than people in a skilled nursing facility."

8

Though Schwartz's first statement is a little jarring, the larger context of the deposition indicates that her fundamental concern was about businesses or other entities in residential zones. Schwartz said that she would want to know if a detox facility was coming into her neighborhood because "residential is zoned that way for a reason" and that she probably wouldn't want a general practitioner's office in her neighborhood either "if it wasn't zoned that way." Schwartz's second comment, in context, likewise doesn't reveal discriminatory intent. In the deposition, Quality of Life's attorney defined "detox" for Schwartz as "a facility . . . where people who have significant levels of drugs or alcohol in their system go for medical care, tranquilizing and other care, until the drugs and alcohol work their way out of the system." Given this definition, Schwartz's comment that detox-facility patients have a "far more critical and possibly far more dangerous" condition seemed to recognize that, in withdrawing from harmful substances, such patients are in a vulnerable position and require medical attention. And when stating that detox-facility patients may be a "possible danger," Schwartz specified that she thought they could pose a danger to "themselves," as well as others, "because [of] their condition." In addition, these comments were made during a deposition—not while Schwartz was "explaining [her] basis for the

9

contested decision"—which renders them even less persuasive.[5]  *See Cinnamon Hills*, 685 F.3d at 920.

Quality of Life also asserts that the City's administrative acts—specifically, the City's request that Jimenez sign an affidavit and the noted restriction on her property's certificate of occupancy—evidence disparate treatment.  Not so.  The City sought assurances from Jimenez through the affidavit only after she indicated that she might use the City's approval for an assisted-living facility to instead operate a detox.  Moreover, the affidavit was prepared by Jimenez's attorney.  Quality of Life's argument about the certificate of occupancy fares no better.  The City specified "no medical detox" on the certificate of occupancy because of its concern that Jimenez might use the certificate to seek licensure from the state to operate a detox facility—a use that Jimenez had never applied for and that the City had never approved.  The City's acts constitute neither direct nor circumstantial evidence of disparate treatment.

**b**

Quality of Life further argues that § 16.2(B)—the City's zoning ordinance governing special-exception uses for residential zones—is facially discriminatory.

---

[5] To the extent that Quality of Life argues that it was the fear and bias of private citizens that drove the City to prevent it from operating as a detox, we are unconvinced.  "[E]vidence that neighbors and city officials are biased against recovering substance abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers."  *Schwarz*, 544 F.3d at 1216–17.  As we explain, Quality of Life has not made that showing.

10

According to Quality of Life, the ordinance impermissibly applies different criteria to special-exception uses for the elderly than it does to special-exception uses for dependent children and the physically handicapped. More specifically, Quality of Life points to language in § 16.2(B) that indicates special-exception uses catering to dependent children and the physically handicapped, but not those catering to the elderly, (1) must be designed for "sixteen (16) clients or less," (2) are permitted only if they don't "provid[e] psychiatric care," (3) and are subject to other impact-related criteria. This, Quality of Life contends, "exclude[s] people in recovery from [residential] zones."

By alleging that § 16.2(B) is discriminatory, Quality of Life is, in effect, challenging "[t]he basic purpose of zoning," which "is to bring complementary land uses together, while separating incompatible ones." *Schwarz*, 544 F.3d at 1221. Even if a drug-detox facility wouldn't be allowed in a residential zone because of § 16.2(B), the City acknowledges that detox facilities are, and always have been, allowed to operate in community-facility zones. Unlike other cases in which zoning ordinances have been invalidated as facially discriminatory, the City's zoning ordinance doesn't operate to ban detox facilities entirely. *Cf. MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 345 (6th Cir. 2002) (holding that "the blanket prohibition of all methadone clinics from the entire city is

11

discriminatory on its face").  Section 16.2(B) is neither facially discriminatory nor evidence of disparate treatment.

**c**

As its last piece of disparate-treatment evidence, Quality of Life contends that a 2017 amendment to the City's zoning code—which added "detoxification facilities" as a permitted use in community-facility zones, alongside hospitals and other long-term care facilities—is discriminatory.[6]  This amendment to the City's code isn't evidence of disparate treatment.  Under the City's zoning categories, a "permitted use" is a use allowed *as of right*.  The addition of "detoxification facilities" as a permitted use actually shows that the City's zoning code *expressly permits* detox facilities, albeit in certain zones.  And as far as we can tell, nothing would prevent Quality of Life from seeking, through the City's normal variance-request procedures, that its property be re-zoned to a community-facility designation so that it could support a detox facility.

**2**

Now, to Quality of Life's disparate-impact claim.  We've held that "the relevant comparison for disparate impact purposes 'is between (1) recovering alcoholics and recovering drug abusers ("recoverings") and (2) people who are

---

[6] To the extent that Quality of Life asserts that other changes to the zoning code impacted its approval to operate an assisted-living facility, the City responds that it advised Jimenez that the prior approval for an assisted-living facility would not be affected by the changes.

neither recovering alcoholics nor recovering drug abusers ("non-recoverings").'"

*Schwarz*, 544 F.3d at 1217 (quoting *Tsombanidis v. West Haven Fire Dep't*, 352

F.3d 565, 577 (2d Cir. 2003)). "[I]t's not enough to show that a few people are

affected by a policy—rather, the disparity must be substantial enough to raise an

inference of causation." *Schaw v. Habitat for Humanity of Citrus Cty., Inc.*, 938

F.3d 1259, 1274 (11th Cir. 2019). "Typically, a disparate impact is demonstrated

by statistics." *Hallmark*, 466 F.3d at 1286; *see also Schwarz*, 544 F.3d at 1217

(explaining that "plaintiffs could have made a *prima facie* case of disparate impact

by providing statistical evidence" (quotation omitted)).

Quality of Life must demonstrate that the City's zoning decisions had a

greater adverse impact on people in recovery (*i.e.*, its potential clients) than those

not in recovery. It hasn't made this showing. Quality of Life presented only one

entity, VIP Memory Care, as evidence of disparate impact. Because VIP is

allowed to provide medical services to "patients who suffer from memory loss" in

a residential zone, Quality of Life's argument goes, the City's decision to exclude a

detox facility (which also provides medical services) from the same residential

zoning category constitutes a disparate impact. But VIP isn't a true comparator.

That entity received the exact same approval from the City that Quality of Life

received—permission to operate an assisted-living facility in a residential zone. In

order for the City's treatment of VIP to constitute evidence of disparate impact,

13

Quality of Life would've had to have applied to operate *a detox* and been rejected.[7] It didn't do so. "Because [Quality of Life] has completely failed to present relevant comparative evidence, the district court was right to reject its disparate impact claim." *Schwarz*, 544 F.3d at 1218.

**3**

Lastly, we address Quality of Life's argument that the City failed to provide a reasonable accommodation. We've held that "the duty to make a reasonable accommodation does not simply spring from the fact that the handicapped person wants such an accommodation made." *Schwarz*, 544 F.3d at 1219 (quotation omitted). A defendant must be "given an opportunity to make a final decision with respect to [a plaintiff's] request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law." *Id.* (quotation omitted). "Simply put, a plaintiff must actually request an accommodation and be refused . . . ." *Id.*

Quality of Life's first problem is that it didn't request a reasonable accommodation. It argues that Jimenez made two such requests: (1) a written request in a March 28, 2017 letter to the City, in which she wrote that, although she

---

[7] We similarly reject Quality of Life's argument that it is its own "strongest comparator." Even if it could be a comparator with itself, Quality of Life would have had to have applied to operate a detox facility and been rejected for there to be any comparison with its approved application to operate an assisted-living facility.

14

swore under oath that she would never operate a detox facility, she was now "requesting that approval"; and (2) an oral request for a reasonable accommodation at a May 3, 2017 meeting, when she told the City Commission that she was planning on using the building as a detox and that she "would like a reasonable accommodation" because she couldn't get a license from the state to open an assisted-living facility (due to the supposed moratorium).

We note initially that Quality of Life didn't comply with the City's procedure for requesting reasonable accommodations. Even assuming that this failure isn't fatal to its claim,[8] it suggests that Quality of Life didn't provide the City with the information that it needed to "conduct a meaningful review" of its purported request. *See Schwarz*, 544 F.3d at 1219 (quotation omitted). Jimenez may have suggested in the letter, or stated explicitly at the meeting, that she wanted a "reasonable accommodation," but importantly, she never fully explained why the accommodation was reasonable or necessary to accommodate the detox facility's potential patients. Rather, Jimenez seems to have cast her requests to

---

[8] In *Schwarz*, we acknowledged that "[s]everal courts have held that if there is a local procedure (such as a variance process) through which the plaintiffs can obtain the accommodations they want, they must use that procedure first and come away unsatisfied prior to filing suit in federal court." *Schwarz*, 544 F.3d at 1219 n.11. The *Schwarz* Court ultimately had "no occasion to address the matter" because "the City d[id] not argue that there were any local procedures available" to the plaintiffs in that case. *Id.* Here, by contrast, the City of Margate has had reasonable-accommodation procedures in place since 2008.

15

operate a detox as necessary to avoid what she took to be a state-wide moratorium that prevented her from opening an assisted-living facility.

Quality of Life attempts to escape its failure to request a reasonable accommodation by arguing that any efforts to do so would have been futile. It argues that several comments made at the May 3, 2017 meeting—including Commissioner Peerman's statement that private citizens had opposed a *different* detox facility—demonstrate futility. But at that same meeting, Mayor Ruzzano suggested that Jimenez call the City to put her on the agenda, apparently for a future meeting. The mayor didn't say that Jimenez could *never* operate a detox. Rather, he said "the thing is, right now, you cannot put the detox there," while also telling Jimenez that she could pick up the permit for the use that she *was* approved for (an assisted-living facility). The lack of futility in this case is even more stark when compared with a case on which Quality of Life relies, *MX Group, Inc. v. City of Covington*. In that case, the Sixth Circuit held that the plaintiff had sufficiently exhausted administrative remedies because he "had already faced substantial opposition from city administrators" and the City had—after the plaintiff found a *new* location for his methadone clinic—changed the city's zoning code to bar such a clinic "from opening in any zone in the city." *MX Group*, 293 F.3d at 343–44.[9]

---

[9] Quality of Life also asserts that the 2017 amendment to the zoning code is further evidence of futility. As we have explained, *see supra* at 12, this argument fails.

16

* * *

In sum, Quality of Life cannot show disparate treatment, disparate impact, or that the City failed to provide a reasonable accommodation. The district court didn't err in granting summary judgment in favor of the City on Quality of Life's discrimination claims.

**B**

We next address Quality of Life's claim that the district court erred in granting summary judgement on its state-law estoppel claim. In *Coral Springs Street Systems, Inc. v. City of Sunrise*, we explained that, under Florida law, vested rights in something like a building permit can be created in two ways: (1) "when a party has reasonably and detrimentally relied on existing law, creating the conditions of equitable estoppel," or (2) if detrimental reliance hasn't been demonstrated, "when the defendant municipality has acted in a clear display of bad faith." 371 F.3d 1320, 1334 (11th Cir. 2004). The "first and more common way a vested right is created"—the doctrine of equitable estoppel—can be invoked against a local government "when a property owner (1) in good faith (2) upon some act or omission of the government (3) has made such a substantial change in position or has incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the right he acquired." *Id.* (quotation omitted).

17

Quality of Life doesn't dispute that it never applied to operate a detox facility and that, accordingly, the City never gave its approval for such a use. *See* Br. of Appellants at 52–53 ("[Quality of Life] did not obtain approval from the City specifically for a detoxification facility, and [Quality of Life] did not allege this."). It instead asserts that it has "vested rights to offer onsite medical services." But Quality of Life applied to operate an "independent living facility," which would require only "one nurse practitioner" and "[o]ne RN on call 24/7." When appearing before the City Commission, Jimenez described her project as "an assisted living facility" that would cater to "people that are mostly healthy." And while Jimenez stated that she would be "working with a doctor," she explained further that she would be "partnering up" with him because the doctor's twin brother (also a doctor) operated an assisted-living facility elsewhere in Florida. The City approved Quality of Life's application based on these representations.

The City consistently rejected Quality of Life's attempts to operate a drug-detox facility because that is not the use that the City had approved. Quality of Life's building plans were accepted by City officials only after Jimenez removed labels (*e.g.*, "Margate Rehabilitation Center" and references to inpatient treatment areas) that indicated that she was attempting to build a drug-detox facility. Although the building plans apparently met "Institutional Group I-2" standards (which encompass medical facilities) under the Florida Building Code, such a

18

distinction doesn't change the zoning designation or the approved use. Thus, Quality of Life cannot claim detrimental reliance because it is—and has always been—the City's position that Quality of Life could operate as an assisted-living facility, but not as a drug-detox facility. Because Quality of Life cannot prove equitable estoppel and there is no evidence that the City acted "in a clear display of bad faith," *Coral Springs*, 371 F.3d at 1334, Quality of Life's vested-rights claim fails.

## C

Quality of Life also argues that the district court erred in "failing to address" its request for declaratory and injunctive relief. Other than the blanket assertion that the district court committed "reversible error," Quality of Life doesn't cite any cases or flesh out its argument. By failing to explain its claim, we consider Quality of Life's argument to be abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). Even if we construed its briefs more liberally, the district court *did* address Quality of Life's claims for declaratory and injunctive relief—and it denied them. The district court held that "[t]he declaratory and injunctive relief sought is neither necessary nor warranted." After deciding that the underlying FHA, ADA, and estoppel claims

19

failed, neither injunctive nor declaratory relief *could* be granted.  We therefore affirm the district court's denial of declaratory and injunctive relief.

### D

We turn, finally, to examine Quality of Life's last claim—that the district court erred in denying its motion for reconsideration.  Quality of Life devotes one sentence to challenging the district court's order by asserting that the district court abused its discretion and that the errors "resulted in manifest injustice."  Quality of Life cites only one case, *Rodriguez v. City of Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017), seemingly for the standard of review.  This lack of explanation leads us to consider this claim abandoned, as well.  *See Sapuppo*, 739 F.3d at 681.  In any event, the district court didn't abuse its discretion.  "A motion for reconsideration cannot be used 'to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.'"  *Richardson v. Johnson*, 598 F.3d 734, 740 (11th Cir. 2010) (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)).  The district court denied Quality of Life's motion because Quality of Life raised "many of the same arguments" as it did at summary judgment, confirming that it merely disagreed with the district court's summary judgment order.  Refusing Quality of Life's attempt to get another bite at the apple is not an abuse of discretion and we therefore affirm the district court.

20

## III

In conclusion, the district court didn't err in granting the City's motion for summary judgment. Quality of Life cannot show that the City discriminated against it in violation of the ADA and FHA. The district court also properly rejected Quality of Life's state-law estoppel claim and its request for declaratory and injunctive relief. Finally, the district court didn't abuse its discretion in denying Quality of Life's motion for reconsideration.

**AFFIRMED.**