Steven CASTRO, Plaintiff,

v.

CITY OF NEW YORK, Council of the City of New York, Speaker Christine C. Quinn, sued in her official and individual capacity, Council Member Julissa Ferreras, sued in her official and individual capacity, and Yoselin Genao, Deputy Chief of Staff, sued in her official and individual capacity, Defendants.

No. 10–cv–4898(NG)(VVP).

United States District Court, E.D. New York.

Signed June 3, 2014.

Filed June 5, 2014.

Linda Cronin, Susan P. Bernstein, Cronin & Byczek, LLP, New Hyde Park, NY; Dominick Peter Revellino, Cronin & Byczek, LLP, Lake Success, NY, for Plaintiff.

Eric Jay Eichenholtz, NYC Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

### OPINION & ORDER

GERSHON, District Judge:

Plaintiff Steven Castro brings this action seeking damages and equitable relief pursuant to Titles I and V of the Americans With Disabilities Act of 1990 (the "ADA"); the Rehabilitation Act of 1973 (29 U.S.C. § 794); 42 U.S.C. § 1983; and the New York State and City Human Rights Laws (New York State Executive Law § 296 and N.Y.C. Admin. Code § 8–107, respectively). Plaintiff asserts these claims against the City of New York, the Council of the City of New York, Council Member Julissa Ferreras, and Yoselin Genao, the Council Member's Deputy Chief of Staff.

Plaintiff's complaint, filed October 25, 2010, initially included as a defendant

then-City Council Speaker Christine Quinn and claims asserted under the Fair Labor Standards Act and the New York Labor Law. (*See* Compl. ¶¶ 20, 42–55.) At the March 15, 2011 pre-motion conference, plaintiff agreed to withdraw his state Labor Law claim, as well as all claims against former Council Speaker Quinn. (*See* ECF Document # 15; *see also* Plf. R56.1 Response [1] ¶ 2.) During the pre-motion conference held January 24, 2012, plaintiff withdrew his Fair Labor Standards Act and Due Process claims. (*See* ECF Document # 36; *see also* Plaintiff's Rule 56.1 Response ¶ 2.) The claims that remain, therefore, are: those made pursuant to the ADA; the § 1983 equal protection claim against the individual defendants only;[2] and all claims under the Rehabilitation Act and the State and City Human Rights Laws. The defendants now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all of these remaining claims.

## I. BACKGROUND

### A Facts

The following recitation of the events giving rise to this lawsuit is based on factual assertions which are, unless otherwise noted, undisputed.[3]

Plaintiff Steven Castro ("Castro") is a resident of Queens County, New York and was at the time of these events approximately 23 years old. Castro suffers from cerebral palsy, a medical condition resulting from an injury he sustained at birth. Notwithstanding his condition, plaintiff "is high functioning, can ambulate on his own, drive a motor vehicle and is capable of full time work." (Compl. ¶ 25.)

Defendant Julissa Ferreras ("Ferreras" or the "Council Member") was elected to membership in the New York City Council in 2009 and represents District 21, which includes the Elmhurst, East Elmhurst, Corona and Jackson Heights neighborhoods of Queens. Ferreras had a friendly relationship with Castro's uncle, Charles A. Castro ("Charles Castro" or "Charlie"), which dated back to around 1999 or 2000. (C. Castro Dep.[4] 12.) Charles Castro also had a longstanding friendly and professional relationship with then-New York State Senator Hiram Monserrate, including a stint as his chief of staff from January to July of 2001. (Plf. R56.1 Response ¶ 5; *see also* C. Castro Dep. 11.)

Sometime in 2009, Charles Castro began to seek out employment opportunities for plaintiff, as plaintiff had not, prior to that time, had any experience with office or clerical work. When Charles Castro asked Senator Monserrate about the possibility of his employing plaintiff, the senator sug-

---

1. Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts.

2. Plaintiff withdrew his claim of municipal liability when he filed his opposition papers. (*See* Plf. Opp. Mem. 6.)

3. Plaintiff's Rule 56.1 Response contains many purportedly responsive paragraphs in which plaintiff "admits" defendants' corresponding statement but interjects commentary or argument in an effort to create an issue of fact. Such interjections neither specifically controvert defendants' assertions, nor enjoy evidentiary support. As such, they fail to establish an issue of fact and defendants'

assertions are deemed admitted. *See* Local Civil Rule 56.1(c). Plaintiff's Rule 56.1 Response is cited for admitted assertions only.

4. Transcript of the Examination Before Trial of Non–Party Charles A. Castro, September 13, 2011. Excerpts from this transcript are annexed to the January 4, 2013 Declaration of Linda M. Cronin (the "Cronin Decl.") at Exhibit B (ECF Document # 51–2), and to the Eichenholz Am. Decl. at Exhibit E (ECF Document # 48). Each party has submitted different portions of the transcript; neither has provided the complete transcript.

gested that he approach Ferreras, "because you really helped her out a lot. Maybe she can help him out."[5] (Plf. R56.1 Response ¶ 6.) Charles Castro subsequently spoke with Ferreras about his desire to find a job for his nephew, to which Ferreras responded, "Bring him in." (C. Castro Dep. 12.) There is no dispute that there was, at this time, no discussion as to the rate at which Steven Castro would be paid.[6] While it was not uncommon for the Council Member to hire staff members on a volunteer basis and to subsequently take them on as paid employees, there was never an express discussion of such an arrangement in plaintiff's case. Ferreras was aware of Castro's disability at the time that she agreed to hire him, as she had met and interacted with him previously.

Castro began working in Ferreras's district office, in Queens, on September 7, 2009. His supervisor was Angel Audiffred, Ferreras's chief of staff at the time. Charles Castro told Audiffred "not to treat plaintiff any differently," and plaintiff enjoyed a good relationship with Audiffred at the outset of his employment.[7] (Plf. R.56.1 Response ¶¶ 12–13.) Initially, Castro reported to work five days a week, from 9:00 a.m. to 5:00 p.m.; but in October 2009 his hours were reduced to 10:00 a.m. to 3:00 p.m.; and in January 2010, his schedule was changed again, and he was told to report to work from 10:00 a.m. to 1:00 p.m. daily.

Castro's responsibilities in the Council Member's office included some typing and other clerical tasks, and he was also asked, along with other employees, to empty the office garbage cans twice weekly. (See id. ¶ 15.[8]) He was asked a few times to transport boxes from Ferreras's office in City Hall back to her district office. Plaintiff felt that this was "difficult work," and he

---

5. Charles Castro testified that he provided volunteers and other assistance to Ferrera during the course of her campaign. (C. Castro Dep. 12.) This testimony is undisputed.

6. Plaintiff contends, however, that Charles Castro's intention at the outset was to secure for plaintiff a job that paid a salary and provided benefits. (See C. Castro Dep. 49 ("When I discussed with her that I needed to get him a job with health benefits and a salary she said, 'Bring him in.' "); see also id. at 49–50 ("I know a lot of other[ ] organizations I could have sent my nephew to work volunteer for anybody [sic] not to get paid.... But that wasn't the point behind this. The point was for him to get a job where he was going to get health benefits and salary.").) Nonetheless, there is no dispute that the amount of plaintiff's remuneration was not discussed prior to the commencement of his employment.

7. Although plaintiff does not dispute that Charles Castro made such a statement, he asserts that it was made in order "to reassure' [Audiffred and Ferreras] that plaintiff will work efficiently," and not to suggest that plaintiff should be required to perform tasks that would be physically difficult for him. (Plf. R56.1 Response ¶ 12.) Regardless of his intent, there is no dispute that Charles Castro made this request of Audiffred. (See C. Castro Dep. 15 (In response to the question whether he requested that his nephew "be treated special or differently in any way," Charles Castro testified, "Absolutely not. No. In fact, I stressed to Angel [Audiffred] make sure that he does exactly what he's supposed to do. And if you have any issues with him-because I want to make sure that he doesn't embarrass me").)

8. Plaintiff "denies" this paragraph "as incomplete and inaccurate," but there is nothing in plaintiff's response that actually contradicts or otherwise controverts defendants' statement. Rather, plaintiff responds by naming two other employees—both more senior than he—who did not take out the garbage; he then goes on to recite a litany of non-responsive arguments based on unrelated facts. (See Plf. R56.1 Response ¶ 15.) Moreover, plaintiff testified that he and the other employees "take turns" emptying the garbage cans. (Castro Dep. 48.) That plaintiff was not the only employee who took out the office garbage is therefore undisputed.

did not appreciate being asked to do it. (Plf. R56.1 Response ¶ 68.) Although he generally did not discuss his disability with anyone in the office, there were a few occasions on which plaintiff complained about the heavy lifting. Once, he told a co-worker that the garbage bags were too heavy, which led the co-worker to help him. On another occasion, when Audiffred asked plaintiff and the same co-worker to move boxes of bottled water, plaintiff told Audiffred that he could not do it. Plaintiff testified that Audiffred "said okay" and sent him back inside. (Castro Dep. 42–43;[9] *see also* Plf. R56.1 Response ¶ 71[10].) And in December 2009, while moving boxes of toys for a Christmas party, Plaintiff told another employee, Maryann Smith–Jackson, that he could not lift more than 50 pounds at a time; she told him to "take [his] time." (*See* Castro Dep. 31–35.)

During his time in the Council Member's office, Castro did not form close relationships with the other staff members. He testified that, aside from Smith–Jackson, "nobody talked to me, nobody had a conversation with me." (*Id.* at 40.) However, he also testified that he was "shy" and that he "kept [ ] to himself" his feelings of being excluded by the other staff members. (*Id.* at 40–41.) Plaintiff further testified that, on at least one occasion, Genao "was laughing [about] the way I walked.... When I walked by, she looked at me and laughed." (*Id.* at 36; *see also* Plf. R56.1 Response ¶ 62.) Castro also testified that there was a time he believed Genao called him a derogatory name in Spanish, but he was not sure of the word she used or of its meaning. (Plf. R56.1 Response ¶ 63.) On another occasion, Council Member Ferreras "yelled at" Castro; and although he testified that she yelled at him because he "didn't finish [his] work on time," he also testified that he believed she yelled at him because of his disability. (Castro Dep. 76; *see also* Plf. R.56.1 Response ¶ 21.) Plaintiff also testified that there was a time that he asked Audiffred for a MetroCard so that he could travel to Manhattan, but Audiffred instead asked him to see if Charles Castro would cover the trip.

To the extent Castro believed be was being treated unfairly, he complained to his uncle but did not mention any of these incidents to anyone in the Council Member's office, nor did he file any type of formal grievance or complaint during the time of his employment.[11]

With the exception of the time that Ferreras "yelled at" plaintiff, neither she nor any of her staff members made any other comments about Castro's work during the time of his employment. However, Audiffred testified that, in response to plaintiff's periodic tardiness and absence, he reminded Castro "that if he is going to

---

**9.** Transcript of the Examination Before Trial of the Plaintiff, Steven Castro, August 26, 2011. Excerpts from this transcript are annexed to the Cronin Decl. at Exhibit A (ECF Document # 51–1), and to the Eichenholz Am. Decl. at Exhibit D (ECF Document # 48). As with the transcript of the C. Castro deposition, each party has submitted different portions of the transcript; neither has provided the transcript of plaintiffs deposition testimony in its entirety.

**10.** The assertion that plaintiff "was asked to carry boxes of water on more than one occasion" (Plf. R56.1 Response ¶ 71), is flatly contradicted by plaintiff's statement at deposition that he was asked to carry boxes of water only one time (Castro Dep. 42–43).

**11.** Although Castro "denies" defendants' statement that "plaintiff did not **file** or make any complaints when he worked for Council Member Ferreras," he asserts only that he complained to his uncle. (Plf. R56.1 Response ¶ 79, emphasis in original.) It is therefore undisputed that Castro did not complain to anyone other than Charles Castro during the time of his employment.

be out or late, that he should let me know." (Audiffred Dep.[12] '70.) And Charles Castro testified that Genao told him at some point that "all [Castro] does is play on the computer all day long."[13] (C. Castro Dep. 26; *see also* Plf. R56.1 Response ¶ 23.)

In early November, 2009, Audiffred notified all staff members, including plaintiff, that their seats were being reassigned. There is no dispute that plaintiff was not informed of the reason for the change.[14]

In or around October 2009, several weeks after Castro began working in Ferreras's office, he completed, with his uncle's assistance, a packet of personnel forms. He returned the completed paperwork but subsequently was told that the forms had been lost, and he was therefore asked to complete them again. Plaintiff completed the forms a second time in late October or November 2009 but still was not placed on the Council payroll and did not receive any pay. (Plf. R56.1 Response ¶ 30; *see also* Castro Dep. 28.)

Sometime after the second set of forms was completed, Charles Castro met with Audiffred and Michael Nieves in order to discuss plaintiff's pay.[15] (Plf. R56.1 Response. ¶ 31.) Even after that meeting, however, Ferreras's office did not pay plaintiff, and in a November 17, 2009 email to Audiffred, Ferreras wrote, "Charlie's nephew has not been paid? ? ? What's up? I thought he was on payroll already?" (*Id.* ¶ 34; *see also* Eichenholz Am. Decl. Ex. N.) By email dated November 25, 2009, Audiffred responded that he had "explained to Charlie a few days ago" that he, Audiffred and plaintiff "have to sit down and figure out how much we owe [S]teven," and that Charles Castro agreed to "come by" the following week. (Eichenholz Am. Decl. Ex. O.) He further wrote, "[I] will let you know how much that comes out to ... [I] estimate it's about $500." (*Id.*, ellipsis in original.)

On November 30, 2009, Castro emailed to Audiffred a calendar setting forth the dates he had reported to work prior to that time. In a December 14, 2009 email to Ferreras, Charles Castro wrote that Audiffred had indicated to him that plain-

---

**12.** Transcript of the Examination Before Trial of Non–Party Angel Audiffred, October 28, 2011. Excerpts from this transcript are annexed to the Cronin Decl. at Exhibit C (ECF Doc. # 51–3), and to the Eichenholz Am. Deck at Exhibit H (ECF Doc. # 48). As they did with the transcript of the C. Castro deposition, the parties submit excerpts only; neither has provided the Audiffred transcript in its entirety.

**13.** When asked whether he ."ever hear[d] from anyone" in Ferreras's office "about any problems they were having with Steven," Charles Castro testified as follows:

Only afterwards, like when he was no longer there. I remember Yoselin [Genao] saying. "Oh all he does is play on the computer all day long, you know."
And my nephew said, "Yeah." He goes, "That's what everybody does. That was his answer. But that's the only thing that I remember her telling me.

But up to that point, no one ever called me....
(C. Castro Dep. 26.) The timing of this conversation is not specified.

**14.** In his affidavit dated March 8, 2012, Audiffred avers that the reassignment was undertaken in response to complaints about plaintiff's viewing of "inappropriate" websites at the front of the office, but he did not offer deposition testimony as to this point. (*See* Eichenholz Am. Decl. Ex. W ¶ 13.)

**15.** Charles Castro testified that Michael Nieves is someone he knows "through politics," and who "used to work here in the City Council," but who was not at that time working for Ferreras. (C. Castro Dep. 21–22.) Nieves's role in these discussions is not clear, except that Charles Castro testified that Nieves paid for the three men's lunches. (*Id.* at 21.)

tiff was to receive a $500 stipend, which Charles Castro estimated amounted to "less than $10.00 per day." (Eichenholz Am. Decl. Ex. P.) Charles Castro also wrote that plaintiff had "been there without a check since September," and asked Ferreras to "pay him at least the minimum wage and see to it that Angel gets him paid." (*Id.*)

In January 2010, Ferreras terminated Audiffred as her chief of staff and hired Emmett Hare to replace him.[16] On January 4 and 5, 2010, Castro provided Ferreras with the calendars he had previously sent to Audiffred, as well as a calendar containing his December 2009 hours, and he also began contemporaneously recording the hours he worked.

In early March, 2010, Castro and Ferreras signed an "Office Clerical Consultant Contract" (the "Consulting Contract"), pursuant to which Castro was to be paid as a "Consultant" at the rate of $10.00 per hour, up to a total of $5,000, for the provision of certain clerical services including "assigned office work," "storage and filing of documents" and "distribution of mail and faxes to appropriate staff."[17] (Eichenholz Am. Decl. Ex. U.) On March 10, 2010, plaintiff received a check for $3,425, which represented payment for 340.5 hours in accordance with the Consulting

Contract.[18] (*See id.* Exs. U, V.) That same day, plaintiff resigned from employment with Ferreras, but he did not discuss the reasons for his resignation with the Council Member or any of the staff members. He did, however, tell Emmet Hare that he "didn't like [his] schedule." (Plf. R56.1 Response ¶ 53, alteration in original.)

On April 15, 2010, plaintiff filed a charge of discrimination, hostile work environment and retaliation with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR"). The NYSDHR dismissed the charge for administrative convenience (so that plaintiff could pursue his rights via an action in this court) on June 23, 2010. (Eichenholz Am. Decl. Ex. C.) On August 4, 2010, the EEOC issued a "Right to Sue" notice.[19] Plaintiff initiated the instant action by filing the Complaint on October 25, 2010. As previously stated, several of plaintiffs claims were withdrawn over the course of the parties' pretrial proceedings. The claims that remain to be adjudicated are those for failure to accommodate and disparate treatment pursuant to Title I of the ADA; retaliation pursuant to Title V of the ADA; failure to accommodate and disparate treatment in violation of the Re-

---

**16.** Plaintiff's denial of this assertion contradicts only the reason for Audiffred's termination, and not the fact that he was terminated and replaced by Emmett Hare. (Plf. R56.1 Response ¶ 40.)

**17.** The exact date is not clear: the Consulting Contract is dated March 3, 2010, but the signatures of both Ferreras and Castro are dated March 15, 2010. (Eichenholz Am. Decl. Ex. U at 1, 4.) Moreover, the check to Castro is dated March 10, 2010. (*Id.* Ex. V.) As the parties do not dispute that plaintiff terminated his employment on March 10, the discrepancy as to the date of the Consulting Contract does not appear to be material. (*See* Plf. R56.1 Response ¶ 48.)

**18.** Neither side addresses the apparent discrepancy between the sum actually paid ($3,425) and the agreed-upon rate (340.5 hours at $10 per hour, which would have totaled $3,400.50).

**19.** A copy of the NYSDHR charge is annexed to the Eichenholz Am. Decl. at Ex. B. While a copy of the EEOC charge is not included separately with the filings in this case, a copy of the EEOC's notice of dismissal of the charge/right to sue is annexed to the Complaint. (*See* Eichenholz Am. Decl. Ex. A, at 30.) Defendants do not challenge plaintiff's exhaustion of his administrative remedies.

habilitation Act; hostile work environment; violation of the Equal Protection Clause pursuant to § 1983; and employment discrimination in violation of the New York State and New York City Human Rights Laws (the "NYSHRL" and "NYCHRL," respectively). Plaintiff seeks equitable relief, "prohibiting the defendants from continuing to violate plaintiff's and other disabled employees' civil rights . . . and a reasonable accommodation and reinstatement to his position of 'Council's Aide.'"[20] (Compl. ¶ 114.) Plaintiff further seeks compensatory damages in the amount of $500,000, plus costs and attorneys' fees.

## II. DISCUSSION

### A. Standard on Summary Judgment

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *See, e.g., Nationwide Life Insurance Co. v. Bankers Leasing Association, Inc.*, 182 F.3d 157, 160 (2d Cir.1999). The court construes the facts in the light most favorable to the non-moving party, and it "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d

Cir.2001); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party, however, may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986). Nor may it rely upon the allegations contained in its pleadings. *See, e.g., Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). The non-moving party must, instead, produce specific facts to establish that there is a genuine factual issue to be tried. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. If the evidence is "merely colorable," or "not significantly probative," summary judgment will be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Moreover, where the non-moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim. *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). And, even to the extent a factual issue is raised, summary judgment may nonetheless be granted: "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp. (Motors Holding Div.)*, 758 F.2d 839, 840 (2d Cir.1985).

When intent is at issue, district courts must use caution resolving motions for summary judgment in discrimination cases, since "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). "The summary judgment rule

---

**20.** There is no evidence that plaintiff ever held the position of Council's Aide.

would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001). Therefore, summary judgment is available in such cases, so long as the standards of Rule 56 have been met. *Weinstock v. Columbia University,* 224 F.3d 33, 41 (2d Cir.2000), *superseded by statute on other grounds,* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85.

## B. Individual Liability Under the ADA and Rehabilitation Act

■ Before turning to the merits of plaintiffs ADA and Rehabilitation Act claims, I note that defendants have moved for summary judgment dismissing these claims against the individual defendants, Genao and Ferreras, on the basis that neither statute provides for individual liability. In this Circuit, it is now well-settled that there is no individual liability under the retaliation provision of the ADA. *Spiegel v. Schulmann,* 604 F.3d 72, 79 (2d Cir.2010) (per curiam). Many courts have concluded that this bar to individual liability extends to claims brought pursuant to both Title I of the ADA and the Rehabilitation Act, even where the claims are asserted against individuals acting in their official capacities.[21] *See, e.g., Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 154–55 (E.D.N.Y.2010) (under both the ADA and Rehabilitation Act, "individuals may not be sued in their individual or personal capacity," and "there is no cause of action for

monetary damages for employment discrimination under [these statutes] against a supervisor acting in his or her official or representative capacity") (internal quotation marks omitted); *see also Sutherland v. New York State Department of Law,* 1999 WL 314186, at *7 (S.D.N.Y., May 19, 1999) ("Nor can individuals be named as defendants in ADA or Rehabilitation Act suits in their official or representative capacities."); *see also Thomas v. New York City Board of Education,* 938 F.Supp.2d 334, 354–55 (E.D.N.Y.2013) (collecting cases). Accordingly, the ADA and Rehabilitation Act claims are dismissed as against Genao and Ferreras.

## C. The Discrimination Claims under the ADA and the Rehabilitation Act

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "covered entity" includes an employer, and a "qualified individual" refers to "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §§ 12111(2), (8).

"Discrimination" under this section may include "limiting, segregating, or classifying a[n] ... employee in a way that adversely affects [his or her] opportunities or status ... because of [his or her] disability" and "not making reasonable accommodations to the known physical or mental

---

**21.** A claim for prospective injunctive relief brought pursuant to Title II of the ADA and the Rehabilitation Act may be maintained against an individual acting in her official capacity, but no such claim is implicated here. *Harris v. Mills,* 572 F.3d 66, 72–73 (2d Cir.2009).

limitations of an otherwise qualified individual," unless such "accommodation would impose an undue hardship" on the employer. 42 U.S.C. §§ 12112(b)(1) and 12112(b)(5)(A). A discrimination claim may be based on any of "three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565, 573 (2d Cir.2003). Here, plaintiff's ADA claims appear to be based on both disparate treatment and failure to accommodate.

Like the ADA, the Rehabilitation Act "prohibits disability-based discrimination," but it applies specifically to "government agencies and other recipients of federal funds." *Lyons v. Legal Aid Society*, 68 F.3d 1512, 1514–15 (2d Cir.1995). "Reasonable accommodation" is "interpreted in the same way with respect to both the ADA and the Rehabilitation Act." *Id.* at 1515. Moreover, the statute expressly provides that "the standards used to determine whether this section has been violated in a complaint alleging employment discrimination ... shall be the standards applied under title I ... and the provisions of sections 501 through 504, and 510, of the [ADA], as such sections relate to employment." 29 U.S.C. § 794(d) (statutory citations omitted). Like his ADA claim, plaintiff's Rehabilitation Act claim is apparently based upon both disparate treatment and failure to accommodate.

Claims brought pursuant to the ADA and the Rehabilitation Act are also similar insofar as they are analyzed under the three-step burden-shifting framework originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 96 (2d Cir.2009) (ADA); *see also*

*Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir.2002) (applying *McDonnell Douglas* framework to claims of intentional discrimination under the ADA, FHA and Rehabilitation Act). Accordingly, a plaintiff alleging discrimination under these statutes must establish a prima facie case; if he does so, then "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir.2006). "[T]he ultimate burden rests with the plaintiff to offer evidence sufficient to support a reasonable inference that prohibited [disability] discrimination occurred." *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir.2005) (quotation marks and citation omitted).

### 1. The Intentional Discrimination/Disparate Treatment Claim

In order to make out a prima facie claim of disparate treatment based on disability under the ADA, a plaintiff must show that his employer is subject to the ADA, that he is disabled within the meaning of the statute, that he was "otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation," and that "he suffered an adverse employment action because of his disability." *Shannon v. N.Y. City Transit Authority*, 332 F.3d 95, 99 (2d Cir.2003). The elements of a prima facie claim under the Rehabilitation Act are identical. *See, e.g., Kilcullen v. New York State Department of Labor*, 205 F.3d 77, 79, n. 1 (2d Cir.2000) ("The ADA, adopted in 1992, is broader in scope [than the Rehabilitation Act]," and although "the statutes are not absolutely congruent in their other requirements,

they impose identical obligations upon employers"), *overruled on other grounds, Board of Trustees of University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

Here, there is no dispute that plaintiff's cerebral palsy constitutes a disability within the meaning of the relevant statutes, nor that he was otherwise qualified for his job.[22] In order to establish his prima facie case, then, plaintiff must show that he has suffered an adverse employment action and that such action occurred because of his disability, i.e., under circumstances giving rise to an inference of discrimination. *See, e.g., Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir.1999). While plaintiff's burden at the prima facie stage of the analysis is minimal or "de minimis," *see, e.g., Abdu–Brisson,* 239 F.3d at 467, he must nonetheless offer more in the way of evidence than merely speculative or conclusory allegations in order to withstand a motion for summary judgment, *Cameron v. Community Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir.2003).

An adverse employment action is defined "as a materially adverse change in the terms and conditions of employment." *Sanders v. New York City Human Resources Administration,* 361 F.3d 749, 755 (2d Cir.2004) (internal quotation marks omitted). A "materially adverse" change must be something "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may include, for

example, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," among others. *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003) (internal quotation marks and citations omitted).[23]

It is not enough, however, for plaintiff to demonstrate that he suffered an adverse action. He must also offer evidence showing that any such action occurred under circumstances giving rise to an inference of discrimination. Such an inference may be drawn, for example, where an employer has made "invidious comments about others in the employee's protected group" or where an employer has exhibited "more favorable treatment of employees not in the protected group." *Abdu–Brisson,* 239 F.3d at 468 (citation omitted). The plaintiff's subjective belief that he was discriminated against based on his membership in a protected class, without more, is not sufficient to sustain a claim of discrimination. *See, e.g., Moore v. Kingsbrook Jewish Medical Center,* 2013 WL 3968748, at **6–7 (E.D.N.Y., July 30, 2013) (plaintiffs belief that he was discriminated against based on his national origin was insufficient to survive summary judgment).

Here, plaintiff argues that the defendants' delay in paying him, the assignment of physically challenging tasks, and the steady reduction in his hours constitute adverse actions. He also argues that the combination of these three actions effectively compelled his resignation, and that

---

**22.** In his Opposition papers, plaintiff refers to asthma as another disability within the meaning of the ADA. (*See* Opp. Mem. 1.) However, plaintiff's complaint contains no reference to asthma ·and his allegations of discrimination are based solely on his cerebral palsy.

**23.** Although *Terry* is a Title VII case, courts consider the same factors with respect to

claims brought pursuant to the ADA. *See, e.g., Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir.2008) (finding adverse for purposes of an ADA claim an action that resulted in "less distinguished title and significantly diminished material responsibilities") (internal quotation marks and citation omitted).

he was thus constructively discharged. As set forth below, to the extent that any of these actions can accurately be described as an "adverse employment action" in the context of a discrimination claim, plaintiff has failed to demonstrate that it occurred under circumstances giving rise to an inference of discrimination.

### (a) Delayed Compensation

Turning, first, to the delay in plaintiff's receipt of his paycheck, there is some support in this Circuit for defendant's argument that such a delay is merely an inconvenience and therefore not sufficient to constitute an adverse employment action. In *Miller v. New York City Health & Hospital Corp.*, for example, the plaintiff argued that the delayed receipt of overtime pay constituted an adverse employment action under Title VII. 2005 WL 2022016 (S.D.N.Y., Aug. 22, 2005), *aff'd* 198 Fed.Appx. 87 (2d Cir.2006). The *Miller* court concluded that, although the compensation was delayed by several months, it was ultimately paid, and that plaintiff thus did not establish that he suffered "anything more than a mere inconvenience" with respect to the delay. *Id.*

at *6.[24] Similarly, in *Badrinauth v. Touro College*, the plaintiff alleged that a four-month delay in the receipt of some of his paychecks was an adverse employment action under Title VII, but the court disagreed, holding that "[a] delay in the receipt of a paycheck is not an adverse employment action." 1999 WL 1288956, at *6 (E.D.N.Y., Nov. 4, 1999); *see also Sprott v. Franco*, 1997 WL 79813, at *13 n. 5 (S.D.N.Y., Feb. 25, 1997) (where a plaintiff, alleging discrimination in violation of Title VII, "eventually received her full paycheck, [a]ny delay in receiving the paycheck was a mere inconvenience" and therefore not an adverse employment action). While these cases demonstrate that, in most situations, a delay in the receipt of a paycheck will not constitute an adverse employment action, they cannot be read to establish such a rule as a matter of law.[25]

 Here, it is undisputed that plaintiff failed to receive any compensation for nearly the entire duration of his employment, but it is also undisputed that he was ultimately paid a sum intended to compensate him for all of the hours he had worked. Plaintiff has offered no evidence

---

**24.** The *Miller* court further concluded that even a *four-year* delay in the receipt of another paycheck did not constitute an adverse employment action where the "employee's own errors contribute[d] to delayed payment." *Miller*, 2005 WL 2022016, at *6 (emphasis added). Here, although there is no contention that the delay in Castro's compensation was caused by any error on his part, it bears notice that a plaintiff seeking to assert a discrimination claim based on a delay in the receipt of compensation faces a substantial hurdle.

**25.** Defendant's reliance on *Zerilli–Edelglass v. New York City Transit Authority*, 2010 WL 475314 (E.D.N.Y., Jan. 29, 2010), is misplaced. In that case, plaintiff alleged that defendant's delay in reimbursing certain of her claims for workers compensation benefits was intended to retaliate against her for her

filing of prior lawsuits. 2010 WL 475314, at *1. For an action to be deemed "adverse" in the retaliation context, a plaintiff must demonstrate that it might have dissuaded a reasonable worker from making a charge of discrimination. *Id.* at *2. In *Zerilli–Edelglass*, however, the defendant produced evidence showing that the delay was not unreasonable, and plaintiff offered no admissible evidence to "support her claim that the delay was the result of retaliation, rather than bureaucracy." *Id.* at *3. As such, she could not show that a reasonable worker would have found the delay adverse, and thus failed to establish a prima facie case of retaliation. *Id.* Like the other cases relied upon by defendants, this case fails to support the contention that a delay cannot, as a matter of law, constitute an adverse employment action.

indicating that this delay amounted to anything more than an inconvenience—for example, there is no evidence that the delay caused him any economic harm—nor, given that it is undisputed that the rate and timing of plaintiff's pay had not previously been established, has he offered any support for the conclusion that the delay constituted a materially adverse *change* to the terms or conditions of his employment. As such, plaintiff has not shown that he suffered an adverse employment action sufficient to support his claim of intentional discrimination.[26]

■ Even assuming, however, that plaintiff's unpaid status did constitute a materially adverse change to the terms of his employment, there is simply no evidence upon which to conclude that such change took place under circumstances giving rise to an inference of impermissible discrimination.

Plaintiff argues that the discriminatory intent behind defendants' failure to pay him is evidenced by the more expeditious payment of larger stipends or fees to other individuals who performed services for Ferreras, but that argument is undermined by plaintiff's failure to point to any similarly situated individuals. While a plaintiff seeking to make out a prima facie case "is not obligated to show disparate treatment of an *identically* situated employee," he must show that any such employees "have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.2001) (emphasis in original).

Here, plaintiff points, first, to Michael Olmeda, a consultant hired to conduct staff training sessions including team building and constituent services training. (Ferreras Dep. 55.[27]) This type of work requires a completely different skill set and level of experience than that required of plaintiff—who had, admittedly, never before worked in an office, let alone conducted any sort of training program. "Ordinarily, the question of whether two employees are similarly situated is a question of fact for the jury. This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Desir v. Board of Cooperative Educational Services (BOCES) Nassau County,* 803 F.Supp.2d 168, 180 n. 2 (E.D.N.Y.2011)

---

26. To the extent plaintiff argues that Ferreras's failure to send him to see Peg Toro, the City Council's Assistant Director who oversees the processing of administrative forms, constituted an adverse action, this argument is rejected. First, plaintiff offers only a conclusory statement that "other paid employees" were directed to meet Peg Toro in order to be on payroll" (Opp. Mem. 8), but names no specific employees, and offers no other evidence as to the timing of these meetings. There is no dispute that no agreement was in place with respect to plaintiff's pay at the outset of his employment. A meeting with Ms. Toro in the absence of an agreement as to the rate and terms of plaintiffs pay would have been unnecessary. Moreover, while Ms. Toro testified that newly hired staff members were directed to see her in order to be placed on payroll, she also testified that her office "ha[s] nothing to do with consultants." (Deposition of Peg Toro, October 21, 2011, at 13. Excerpted portions of this transcript are annexed to the Cronin Decl. at Exhibit D, ECF Doc. # 51–4.) Plaintiff was ultimately paid as a consultant.

27. Examination Before Trial of Julissa Ferreras, October 7, 2011. Excerpted portions of this transcript are annexed to the Eichenholz Am. Decl. at Exhibit F (ECF Doc. # 48), the Eichenholz Reply Decl. at Exhibit Y (ECF Doc. # 53), and the Cronin Decl. at Exhibit T (ECF Doc. # 51–20).

(internal citations and quotation marks omitted). Such is the case here.

Anne Meredith, an intern who received a stipend of $1,500 during the course of her internship (*see* Ferreras Dep. 45–46), is likewise not a suitable comparator. Leaving aside that Meredith was hired as an intern and plaintiff insists that he was hired as a paid employee, plaintiff has offered no details as to Meredith's level of experience, education, or any other "objectively identifiable basis for comparability," and thus the contention that a similarly situated employee outside his protected class was treated more favorably amounts to nothing more than a conclusory statement insufficient to defeat summary judgment. *Desir*, 803 F.Supp.2d at 180–81. In any event, plaintiff has not shown that Meredith was treated more favorably than he was, as the evidence shows that Meredith received her $1,500 stipend on July 26, 2011, but her position commenced June 1 of that year, if not earlier.[28] Thus, Meredith was employed for almost two months (or longer) before she received any compensation, much as plaintiff was employed for several months before he received his compensation.

Plaintiff thus has not shown that similarly situated individuals were treated more favorably than he was, and he has offered no other evidence that would connect the delay in his compensation with his disability. He has therefore not made out a prima facie case of disparate treatment on this ground.

### (b) Lifting of Boxes and Office Trash Cans

■ Although Plaintiff argues that other staff members were not required to move boxes and empty the waste baskets, "simply being assigned undesirable work duties ... [is] insufficient to establish adverse employment action, since [it does] not have a material impact on the terms and conditions of plaintiffs employment." *Figueroa v. New York City Health and Hospitals Corp.*, 2007 WL 2274253, at *4 (S.D.N.Y., August 7, 2007). Moreover, any argument that such work assignments occurred under circumstances giving rise to an inference of discrimination is belied by plaintiff's own testimony that the employees "took turns" doing these tasks. (*See* Castro Dep. 48; *see also* n. 8, *supra*.) While plaintiff argues that neither Genao nor Audiffred was required to perform these chores, this comparison neither supports an inference of discrimination nor raises an issue of fact because, like Meredith and Olmeda, neither the Deputy Chief of Staff (Genao) nor the Chief of Staff (Audiffred) was similarly situated to plaintiff. *See Desir*, 803 F.Supp.2d at 180, n. 2. Plaintiff therefore has not established a prima facie case of discrimination on this basis.

### (c) Reduction in Hours

■ While the reduction of plaintiffs hours in October 2009, and again in January and March 2010, would appear to constitute a materially adverse change in the terms and conditions of plaintiff's employment, there is no basis upon which to infer that this was the result of discrimination. Plaintiff asserts, in a conclusory manner, that his hours were cut without explanation and that this act, itself, is sufficient to raise an inference of discrimination. How-

---

**28.** The Council Member's 2011 record of expenditures reflects a payment of $1,500 on July 26, 2011, which is described as a stipend for the period of June 1 through August 29, 2011. (Cronin Decl. Ex. F at 6.) At her deposition, however, Ferreras testified that Meredith began working for her prior to June 1, and that she was, as of October of that year, still working at the office. (Ferreras Dep. 46.)

ever, the mere fact that an individual is a member of a protected class cannot compel the conclusion—or even the inference—that any action taken with respect to that individual is taken *because* of the characteristic that renders him a member of such class. *Richardson v. Newburgh Enlarged City School District,* 984 F.Supp. 735, 744 (S.D.N.Y.1997). Plaintiff offers no evidence connecting the change in his schedule to his disability, and his prima facie case fails on this basis as well.

■ Even assuming a prima face case for the purposes of this motion, however, defendants have offered a legitimate, non-discriminatory reason for their action. Defendants assert that plaintiffs hours were cut because he was not a productive and responsible employee. To that end, Audiffred testified that:

> [plaintiff] was late quite often. And on a couple of occasions he did not come to work and did not give us prior notice and those became issues because there was one incident very early on where he came to work seven hours late because he got into a car accident earlier in the day. And so when he didn't show into work, we either thought the worst or thought he didn't feel like coming into work. That was consistent and it was an issue. And I would consistently bring it to [Ferreras's] attention.

(Audiffred Dep. 69–70.)

Further evidence of Castro's poor work performance is Castro's own testimony that Ferreras "yelled" at him because he did not complete his work (Castro Dep. 76); and that Castro's desk was reassigned because he had been viewing "inappropriate" online material while seated at the front of the office (Audiffred Aff. ¶ 13; *see also* n. 14, *supra* ). Defendants' evidence on this point is not voluminous, but their

burden at this stage is merely "one of production, not persuasion." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Defendants have produced admissible evidence demonstrating a legitimate, non-discriminatory reason for the change to plaintiff's schedule.

Although plaintiff testified that he "just felt like [Ferreras] treated [him] way different[ly]" from the other employees (Castro Dep. 76), he offers no other evidence that would raise an issue of fact as to whether defendants' stated reason for reducing his hours is mere pretext for unlawful discrimination. Plaintiff argues that the pretext "is evident from the fact that [he] never received any kind of feedback or evaluation from defendants" and further, that an email from Audiffred demonstrates that Audiffred "understood" that plaintiff's absences were related to medical issues. (Opp. Mem. 10.) However, the October 2009 email exchange actually demonstrates that Castro was absent for two days *without* notifying Audiffred or anyone else. In Audiffred's message, sent on Saturday, October 17, he asks Castro about his absence from work on *the previous* Thursday and Friday. (*See* Cronin Decl. Ex. J.) Plaintiff responded, on the following Monday, that he had not been feeling well, that his "lungs [were] acting up badly," and that he would be seeing some doctors on the following Thursday and Friday. (*Id.*) Audiffred may have approved the intended subsequent absence,[29] but it is clear that plaintiff did not seek such approval—or even provide notice—with respect to his absence on the preceding two days. This email therefore does not provide proof of plaintiff's purported conscientiousness as an employee, and it thus does not demonstrate that defen-

29. Audiffred responded, "ok. understood [sic]." (Cronin Decl. Ex. J.)

dants' stated reason for changing his schedule was mere pretext.

Since defendants have, through admissible evidence, offered a legitimate, non-discriminatory reason for reducing plaintiff's hours, and since "plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext," summary judgment is appropriate. *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir.2004), *superseded in part on other grounds by* the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, amending 42 U.S.C. § 1981.

### (d) Constructive Discharge

■■ "An adverse employment action may also take the form of a constructive discharge, which occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Caskey v. County of Ontario*, 560 Fed.Appx. 57, 59, 2014 WL 1099232, at *2 (2d Cir., March 21, 2014) (quoting *Morris v. Schroder Capital Management International*, 481 F.3d 86, 88 (2d Cir.2007)). An employee must show more than that the conditions of his employment were merely unpleasant. Rather, he must demonstrate, first, that the employer acted deliberately, and not merely negligently or ineffectively, in bringing about the intolerable work conditions, and next, that, when assessed objectively, a reasonable person in the employee's position would have felt compelled to resign. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229–30 (2d Cir.2004).

■ Here, plaintiff alleges that defendants' reduction of his hours, delay in compensating him, and the nature of some of his work assignments, amounts to a constructive discharge. However, even when viewed in the light most favorable to plain-

tiff, the evidence does not permit such a finding. First, although plaintiff argues that "Ferreras created an environment ... in which any reasonable employee will feel compelled to resign, as there was no hope of future payment if plaintiff continued working" (Opp. Mem. 17), the evidence shows that Castro did not resign until after he received a check compensating him for the hours he previously worked and signed an agreement pursuant to which he would be compensated going forward. The receipt of back pay and an agreement as to future pay would not cause a reasonable person to feel hopeless about future payment.

Plaintiff further argues that he was assigned physical tasks like trash removal and the moving of boxes as part of a deliberate effort to place his health in jeopardy, but the evidence, including plaintiff's own testimony cited previously, demonstrates both that plaintiff was not the only employee to be asked to perform such tasks, and also that, on each occasion plaintiff made other staff members aware that a given task was difficult for him, he was excused from completing it.

Finally, plaintiff contends that his hours were reduced in an effort to compel his resignation, but he concedes that he never informed anyone in the office that he, in fact, wanted to work more hours. Plaintiff testified that, after each time his hours were reduced, he neither asked why nor asked for additional hours, and that, up until the very end, he did not complain about his truncated schedule because he "just wanted to like work," and that he "didn't care about the hours." (*See* Castro Dep. 58–60.) There is no evidence that defendants were aware of plaintiff's negative feelings about the changes to his schedule, let alone that they intentionally implemented those changes in an effort to compel his resignation. As such, no ra-

tional factfinder could conclude that defendants deliberately rendered Castro's working conditions so intolerable as to force him to quit, and summary judgment is granted to defendants on his constructive discharge claim.

## 2. The Failure to Accommodate Claim

The ADA requires employers to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. *See* 42 U.S.C. § 12112(b)(5)(A). The term "reasonable accommodation" means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position ... is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii).

To establish a prima facie case for failure to accommodate, a plaintiff must demonstrate that he is disabled within the meaning of the ADA, that his employer is a covered entity, that he could perform the essential functions of his job with an accommodation, and that the defendants refused to provide such an accommodation. *See, e.g., McBride v. BIC Consumer Products Manufacturing Co., Inc.,* 583 F.3d 92, 96–97 (2d Cir.2009). Such a claim under the Rehabilitation Act requires the same showing. *Stone v. City of Mount Vernon,* 118 F.3d 92, 96–97 (2d Cir.1997). There must also be a causal connection between the disability and the requested accommodation. *See, e.g., Rogers v. Roosevelt Union Free School District,* 2012 WL 6163130, at *6 (E.D.N.Y., December 7, 2012) (granting summary judgment in favor of defendants where plaintiff "failed to demonstrate a causal connection between her disability and her request" for a rea-

sonable accommodation), *aff'd* 553 Fed. Appx. 88 (2d Cir.2014). "Although it is generally 'the responsibility of the individual with a disability to inform the employer that an accommodation is needed,' under certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation." *McElwee v. County of Orange,* 700 F.3d 635, 641–42 (2d Cir.2012) (quoting *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 135 (2d Cir.2008)).

██ Here, plaintiff does not argue that defendants failed to engage in the required interactive process and, in any event, it is undisputed that, each time plaintiff complained that a given task was too difficult, he was either given assistance or told that he could do it slowly or not at all. In the absence of a refusal to provide a reasonable accommodation, plaintiff fails to establish a prima facie case.

To the extent that plaintiff argues that the denial by Audiffred of his request for a MetroCard so that he could take one trip into Manhattan constitutes a failure to accommodate, plaintiff points to no evidence that would demonstrate that this request was made in an effort to enable him to better perform the essential functions of his job. Plaintiff argues that he asked Audiffred for the MetroCard as a reasonable accommodation, "as other staff members received MetroCards and plaintiff had to travel to and from City Hall as he transported heavy boxes." (Opp. Mem. 11.) But plaintiff's own testimony refutes this contention.

In response to the question whether he had ever asked for a MetroCard, Plaintiff testified that, on a single occasion, "I did, I asked Angel, he was like—what did he tell me? Because I didn't have it one time, so he—my uncle—my uncle had to lend me

money to get to the city, because Angel said, see if your uncle could help you." (Castro Dep. 67.) Nothing in plaintiff's testimony demonstrates that Castro requested the MetroCard in order to modify the manner in which his position was customarily performed, so that, in light of his disability, he would have been better able to perform the essential functions of his position. Moreover, Audiffred testified that, while the Council Member's office did occasionally make MetroCards available to unpaid interns or volunteers, there was no program in place whereby everyone in the office was provided with one.[30] (*See* Audiffred Dep. 41–42.) Audiffred further testified that, to his knowledge, Castro often drove to work, which, he thought, would have rendered a MetroCard unnecessary. (*Id.* at 42.) Since plaintiff thus has not demonstrated a causal connection between his request and his disability, he cannot sustain his claim of discrimination for failure to accommodate. *See Rogers,* 2012 WL 6163130, at *6.

Accordingly, summary judgment is granted to defendants on all of plaintiff's ADA and Rehabilitation Act claims of discrimination.

### 3. The Retaliation Claim

Title V of the ADA prohibits discrimination in the form of retaliation against any individual who "has opposed any act or practice made unlawful by this chapter." [31] 42 U.S.C. § 12203(a). As stated previously, there is no individual liability under this provision of the ADA, and plaintiff's retaliation claim against Ferreras and Genao is dismissed. *Spiegel,* 604 F.3d at 79.

The claims of retaliation, as asserted against the City Council and the City, are analyzed under the *McDonnell Douglas* framework, discussed earlier. *See, e.g., Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002). In order to make out a prima facie case of retaliation, "plaintiff must establish that (1) [he] was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir.2000). "Protected activity" includes "oppos[ing] any act or practice made unlawful by this chapter," as well as "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 12203(a).[32]

Here, plaintiff argues that his complaints to Charles Castro constitute protected activity under the ADA, that Charles Castro's subsequent communica-

---

**30.** To the extent that the office had any sort of formal MetroCard program, it was a means by which pre-tax dollars were withheld from employees' paychecks and used to pay for transportation. (Audiffred Dep. 41.)

**31.** Although plaintiff does not expressly state that his retaliation claim is made pursuant to Title V, he does allege that he was retaliated against in violation of the ADA. (*See* Compl. ¶¶ 69–74.) Moreover, plaintiff asserts his retaliation claim *only* under the ADA. However, to the extent that he would urge a broader construction of his complaint, the Rehabilitation Act does contain an anti-retaliation provi-

sion similar to that of the ADA, and it is "governed in this respect by the same standards as the ADA." *Treglia,* 313 F.3d at 719. Any such claim would therefore be dismissed for the reasons set forth *infra.*

**32.** While a request for reasonable accommodation may also constitute protected activity under the ADA, *see, e.g., Weixel v. Board of Education of the City of New York,* 287 F.3d 138, 149 (2d Cir.2002), plaintiff does not argue that he was retaliated against on that basis.

tions with Ferreras and Audiffred demonstrate that defendants were made aware of plaintiffs complaints, and that plaintiff's hours were reduced in retaliation therefor.[33]

Plaintiff's retaliation claim fails because the evidence does not support a conclusion that he engaged in protected activity. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000), *superseded by statute on other grounds,* Local Civil Rights Restoration Act, N.Y.C. Local L. No. 85. There is no dispute that plaintiff did not speak to anyone in the office about his disability or any belief that he was being treated differently or poorly as a result of it. However, "for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of [his] protected activity to establish the knowledge prong of the prima face case." *Kwan v. Andalex Group LLC,* 737 F.3d 834, 844 (2d Cir.2013). Here, plaintiff argues that his conversations with his uncle constitute protected activity and that defendants had general knowledge of these conversations. Even assuming that complaints to his uncle rather than to his employer could constitute protected activity, and construing the evidence in the light most favorable to plaintiff, it is clear that plaintiff's conversations with his uncle were not intended to be efforts to protest or oppose discrimination, and plaintiff therefore fails to establish a prima facie case.[34]

For example, plaintiff testified that he told his uncle in October 2009 that he had not yet been paid (Castro Dep. 17); and that, when Ferreras yelled at him for not completing his work on time, "I told my uncle about it. I was like, why is she yelling at me ... he was like don't mind her" (*Id.* at 76). If plaintiff believed, at the time he discussed these complaints with his uncle, that his treatment was in any way related to his disability, there is no evidence that he conveyed this belief to his uncle. Similarly, plaintiff testified that he "thinks" he told his uncle that Genao laughed at him and made a derogatory comment in Spanish. (Castro Dep. 37.) However, even if plaintiff perceived Genao's behavior to have been motivated by a discriminatory animus, there is no evidence that he discussed it in those terms with his uncle. Charles Castro testified that plaintiff told him only "that they were laughing at him *because they knew he wasn't getting paid*"—not because of his disability—"and they would call him slave." (C. Castro Dep. 25, emphasis add-

---

**33.** The discrimination charges plaintiff filed with the EEOC and New York State Division of Human Rights in April 2010 would constitute protected activity for the purposes of a retaliation claim. But plaintiff does not (and cannot) base his retaliation claim on this filing, since the allegedly adverse action occurred prior to April 2010, and therefore could not be deemed to have been caused by the filing.

**34.** Without a prima facie case, there is no need to proceed to the subsequent stages of the *McDonnell Douglas* analysis. I note, however, that the question of whether the heightened, "but-for" standard of causation for Title VII retaliation claims, articulated by the U.S. Supreme Court in *University of Texas Southwestern Medical Center v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013), applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit. *See Tse v. New York University,* 2013 WL 5288848, at *18 n. 18 (S.D.N.Y., Sept. 19, 2013) ("The Supreme Court's recent decisions in *Gross* [*v. FBL Financial Services, Inc.,* 557 U.S. 167, 176, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)] and *Nassar* may implicate the causation necessary to prevail on an ADA retaliation claim," but "[t]he Second Circuit has not yet articulated what standard now applies for ADA retaliation claims").

ed.) Charles Castro also testified that plaintiff told him "that they were telling him to do things that they know he can't do" such as lifting boxes (*id.* at 25), but there is no evidence that plaintiff believed he was asked to do this work because of his disability or that he conveyed any such belief to his uncle. Rather, when asked why he thought he was asked to do such tasks, plaintiff testified that he thought it was because he and another employee "were the only two guys there." (Castro Dep. 44.) Thus, while these statements to Charles Castro may reflect plaintiff's perception that his experiences in the Council Member's office were unpleasant, they cannot be understood to be statements made in an effort to oppose discrimination. "Ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC,* 470 F.Supp.2d 345, 357 (S.D.N.Y.2007) (dismissing retaliation claim under Title VII on this basis); *see also Goonewardena v. North Shore Long Island Jewish Health System,* 2013 WL 1211496, at **9–10 (E.D.N.Y., March 25, 2013) (finding no protected activity had occurred and dismissing ADA retaliation claim where plaintiff's complaint to hospital administrators did "not contain any language that could reasonably be understood to be a complaint of discrimination on the basis of disability"). Since plaintiff

has not demonstrated that he engaged in protected activity, he has failed to establish his prima facie case.[35]

## D. The Hostile Work Environment Claim

Plaintiff's Complaint contains no explicit statutory basis for his hostile work environment claim. (*See* Compl. ¶¶ 95–102.) Rather, he asserts only the conclusory allegation that "[t]he [d]efendants intentionally and wrongfully discriminated against [him] in his employment on the account [sic] of his disability and retaliated by creating a hostile work environment in violation of the Constitution of the United States and applicable statutes."[36] (*Id.* ¶ 96.) However, the allegations by which plaintiff actually sets forth the ways in which his statutory and constitutional rights were allegedly violated contain no mention of a hostile work environment. (*See id.* ¶¶ 56–82, 103–11.) Although the cases he cites in support of his claim are analyzed under Title VII, I assume for the purposes of this decision that he asserts this claim under the ADA.[37] And, although the question of whether such a claim is cognizable under the ADA is one that remains open in the Second Circuit, *see, e.g., Margherita v. FedEx Express,* 511 Fed. Appx. 71, 73 (2d Cir.2013), the evidence makes clear that no such environment was created here.

---

**35.** To the extent plaintiff argues that he was retaliated against for the complaints levied on his behalf by his uncle, there is no evidence that anything Charles Castro said to the Council Member or her staff was intended as a protest against unlawful discrimination.

**36.** The inclusion of the word "retaliated" here marks plaintiff's only effort to allege that he was subjected to a hostile work environment in retaliation for his complaints to his uncle. Even assuming that he intends to assert such a claim, it would fail, first, because he did not

engage in protected activity, as discussed *supra;* and further, because, as will be shown below, the evidence does not support the conclusion that he was subjected to a hostile work environment.

**37.** *See* Opp. Mem. 12 (citing *Gregory v. Daly,* 243 F.3d 687 (2d Cir.2001) (Title VII); *Alfano v. Costello,* 294 F.3d 365 (2d Cir.2002) (Title VII); and *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62 (2d Cir.2000) (Title VII and 42 U.S.C. § 1981)).

In order to defeat summary judgment on a claim of hostile work environment, "plaintiff must demonstrate (1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (alterations in original) (internal quotation marks omitted). The conduct about which plaintiff complains must be both "severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Thus, plaintiff must demonstrate "not only that [he] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir.2010). The court examines the totality of the circumstances in order to determine whether a single incident was "extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted," as to support a claim of hostile work environment. *Cruz*, 202 F.3d at 570 (internal quotation marks omitted). Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Finally, the plaintiff must show that he was subjected to the alleged hostility because of his membership in a protected class. *Brennan v. Metropolitan Opera*

*Association, Inc.*, 192 F.3d 310, 318 (2d Cir.1999).

▮▮▮ Here, plaintiff alleges that the delay in his compensation and the requirement that he move boxes and empty trash cans, combined with Ferreras's yelling at him and Genao's laughter and name-calling, all amount to instances of discriminatory behavior that contributed to the creation of a hostile work environment.[38] Even construing all of the evidence and resolving all inferences in the light most favorable to plaintiff, however, as discussed previously, there is no basis upon which to conclude that the delay in compensation and the assignment of physical tasks occurred *because* plaintiff was disabled. Moreover, even assuming that Genao's behavior and comments were, in fact, discriminatory, plaintiff testified that incidences of such behavior occurred only a few times over the course of his employment. (*See* Castro Dep. 39–40.) Such isolated, sporadic incidents are insufficiently severe or pervasive as to constitute a hostile work environment. *See, e.g., Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir.1998) (occasional racist remarks that were "despicable and offensive" nonetheless did not "constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile work environment"); *see also Lawless v. TWC Media Solutions, Inc.*, 487 Fed.Appx. 613, 618 (2d Cir.2012) ("the occasional behavior cited by [plaintiff] does not rise to the level of severity or pervasiveness necessary to establish a hostile work environment claim"). Therefore, summary judgment is granted on plaintiff's hostile work environment claim.

**E. The § 1983 Claim**

Section 1983 provides a right of civil action against any person who, under the

---

**38.** To the extent plaintiff discusses the fact that he felt "left out" by the other employees, it is in support of his argument that he subjec-

tively perceived the environment to be hostile. (*See* Opp. Mem. 13.)

color of state law, subjects a plaintiff "to the deprivation of any rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 and the Equal Protection Clause have been held to "protect public employees from various forms of discrimination, including hostile work environment and disparate treatment." *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006).

Much like his hostile work environment claim, plaintiff does not provide a clear basis for his claim under § 1983. Rather, he alleges only that he was deprived of "rights, privileges and immunities secured by the Equal Protection and Due Process guarantees of the Fourteenth Amendment of the Constitution," and that the "[d]efendants have altered rules and regulations and have amended existing policies of anti-discrimination and harassment so as to eliminate the employment of disabled employees." (Compl. ¶¶ 76–77.) Since the latter allegation appears to have been asserted in connection with plaintiffs now-withdrawn claim of municipal liability, and, since plaintiff has withdrawn his due process claim, the sole remaining ground for any purported claim under § 1983 is the denial of equal protection on the basis of disability.

First, it is not clear that such a claim is even cognizable under § 1983. *See, e.g., Chick v. County of Suffolk,* 546 Fed.Appx. 58, 60 (2d Cir.2013) (affirming dismissal of § 1983 claim where "district court correctly determined that disability is not a sus-

pect classification under the Equal Protection Clause, and that a class of one does not exist in the public employment context") (internal quotation marks and citation omitted); *see also Valenzisi v. Stamford Board of Education,* 948 F.Supp.2d 227, 245 (D.Conn.2013) (applying the same reasoning to grant summary judgment in defendant's favor on § 1983 claim based on disability discrimination).

Even assuming the availability of a § 1983 claim, such a claim would fail for the same reasons as plaintiffs other federal claims have failed. Section 1983 does not, itself, create substantive rights, but rather, "provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). In order to prevail on a claim under this Section, "the plaintiff must show that the defendant's conduct deprived him of a federal right." *Id.* Here, as discussed in detail above, plaintiff has not established that he was deprived of any federal right—i.e., he has not demonstrated that he was subjected to disparate treatment, retaliation, or any other type of discrimination on the basis of his disability. He therefore has not established a violation of his constitutional rights and his equal protection claim also fails.[39]

## F. The NYSHRL and NYCHRL Claims

Since defendants are entitled to summary judgment on all of plaintiffs federal claims, all claims over which this court has

---

**39.** Defendants argue that the individual defendants are not subject to liability on this claim because they are entitled to qualified immunity. Pursuant to this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73

L.Ed.2d 396 (1982). Even where a plaintiff has demonstrated that a clearly established constitutional right was violated, government officials are protected from personal liability so long as it was "objectively reasonable" for them to believe that their conduct was lawful. *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013). Given plaintiffs failure to demonstrate a violation of his constitutional rights, I need not reach the question of qualified immunity.

original jurisdiction are dismissed. I therefore decline to exercise supplemental jurisdiction over plaintiff's remaining state and local law claims, pursuant to 28 U.S.C. § 1367(c)(3).

## III. CONCLUSION

Accordingly, for the reasons set forth above, defendants' motion for summary judgment is GRANTED. Plaintiff's claims under the ADA, Rehabilitation Act and Section 1983 (those claims corresponding to the Third, Fourth, Fifth, Sixth and Seventh Causes of Action) are hereby dismissed. Plaintiff's claims asserted under the NYSHRL and NYCHRL (those corresponding to the Eighth and Ninth Causes of Action) are dismissed without prejudice. The Clerk of Court is directed to enter judgment accordingly.